**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-4125**

_____

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

KEVIN NEAL SMITH,

        Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge.  (1:20-cr-00074-AJT-1)

_____

Submitted:  October 18, 2023                    Decided:  December 13, 2023

_____

Before NIEMEYER, THACKER, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Quattlebaum wrote the opinion, in which Judge Niemeyer and Judge Thacker joined.

_____

**ON BRIEF:**  Jonathan Jeffress, Tony W. Miles, Amelia Schmidt, William Zapf, KAISERDILLON PLLC, Washington, D.C., for Appellant.  Jessica D. Aber, United States Attorney, Richard D. Cooke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

QUATTLEBAUM, Circuit Judge:

This appeal arises from Kevin Smith's convictions for wire fraud and conspiracy to commit wire fraud based on his representations that his former employer, SDB Engineers and Constructors, Inc. ("SDB"), was eligible to receive certain government contracts as a women-owned small business when it was, in fact, not a women-owned small business. Smith argues that the district court erred by denying his post-trial motion for judgment of acquittal based on insufficient evidence demonstrating his criminal intent and his post-trial motion for a new trial based on the district court's improper admission of hearsay statements from a witness's plea agreement. But substantial evidence supported Smith's convictions. And even assuming the district court erred by admitting hearsay evidence, any such error was harmless. As a result, we affirm.

## I.  BACKGROUND

### A.  The Small Business Act

We begin with some background on the Small Business Act, 15 U.S.C. §§ 631–47. Under that Act, the Small Business Administration is responsible for implementing the federal government's Women-Owned Small Business ("WOSB") Program. *See id.* § 637(m). With a current goal of awarding 5% of all federal contracting dollars to women-owned small businesses, Congress created the WOSB Program to help level the playing field in federal government contracting for women business owners.[1] In industries in which

---

[1] *See* U.S. Small Bus. Admin., *Women-Owned Small Business Federal Contract Program*, (last updated July 26, 2023), https://www.sba.gov/federal-contracting/

the Small Business Administration has determined that women-owned small businesses are underrepresented, the federal government reserves certain contracts—called "set-asides"—for women-owned small businesses participating in the WOSB Program.[2]

The WOSB Program is implemented through subpart 19.15 of the Federal Acquisition Regulation. Subpart 19.15 provides that a business concern is eligible to participate in the WOSB Program as a women-owned small business if it meets the eligibility requirements set forth in 13 C.F.R. § 127. There, a "women-owned small business" is defined, in relevant part, as a small business concern that "is at least 51 percent owned and controlled by one or more women." 13 C.F.R. § 127.102. In other words, one or more women must not only be the majority owners of the small business, they must also control its "management and daily business operations." *Id.* § 127.202. At all times relevant to this case, a small business could participate in the WOSB Program by obtaining formal certification as a women-owned small business from the Small Business Administration or an approved third-party certifier or by self-certifying that it met the two-part definition of a women-owned small business.[3]

---

contracting-assistance-programs/women-owned-small-business-federal-contract-program [https://perma.cc/6JCY-8LXQ].

[2] *See* U.S. Small Bus. Admin., *Eligible NAICS for the Women-Owned Small Business Federal Contracting Program*, (last updated June 13, 2023) https://www.sba.gov/document/support-eligible-naics-women-owned-small-business-federal-contracting-program [https://perma.cc/EH86-BD4E].

[3] As of October 2020, however, self-certification is no longer sufficient for purposes of WOSB Program participation. *See* 13 C.F.R. § 127.200(c). Only formally certified women-owned small businesses are presently eligible to participate in the WOSB Program. *See id.*

B.  Factual and Procedural Background

In March 2020, a federal grand jury returned a seven-count indictment charging Smith, the former General Manager of SDB, with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and six counts of wire fraud, in violation of 18 U.S.C. § 1343. With respect to the conspiracy count, the indictment alleged that Smith participated in a scheme with SDB Chief Executive Officer Mike Myers and others to falsely represent SDB as a women-owned small business to National Aeronautics and Space Administration ("NASA") prime contractors—QinetiQ North America ("QNA") and Jacobs Technology—in order to receive set-aside contracts under the WOSB Program. Through fraudulently obtained subcontracts from these prime contractors, Smith purportedly helped SDB achieve more than $6.4 million in payments and $1 million in profits.

As a basis for five of the six counts of wire fraud, the indictment identified five instances in which Smith used interstate wire communications to request, and later receive, payments from QNA or Jacobs Technology under those subcontracts. The remaining wire fraud count stemmed from Jacobs Technology's use of interstate wire communications to access Smith's false certification in the federal government's System for Award Management ("SAM") that SDB was a women-owned small business.

Smith was not the only individual from SDB indicted based on this alleged scheme. Myers, Chief Operating Officer Henry Eldredge and one-time majority owner Anne Robins were also charged with various offenses. Myers, Eldredge and Robins each entered into

4

plea agreements with the government. Smith did not. So, we review the evidence from his six-day jury trial.

### i.      History of SDB

Formed in 1994 by Robins and Lawrence Myers (Mike Myers' father), SDB was a Florida corporation that performed contracting and subcontracting work for NASA at the Kennedy Space Center in Florida. At the time of SDB's formation, Robins owned 51% of the company's shares and Lawrence Myers, her romantic partner, owned the remaining 49%. Though SDB was based in Florida, Robins and Lawrence Myers lived in Pennsylvania, where they both worked for Lawrence Myers' other construction-related company, Universal Services Associates, Inc. ("Universal"). The two companies were financially linked, as SDB paid Universal a substantial management fee.

Robins testified that, while she was the majority shareholder, Lawrence Myers controlled the management and day-to-day operations of SDB. Though SDB did not qualify as a women-owned small business under the WOSB Program due to Robins' lack of control over the company, Robins testified that, throughout its existence, SDB pursued set-aside contracts under the WOSB Program anyway, with employees signing representations and certifications that it was a women-owned small business. For instance, by falsely representing itself as a woman-owned small business, SDB obtained a lucrative subcontract from NASA prime contractor QNA in 2011.

In or around 2011, Lawrence Myers became ill, and his son Mike assumed control of SDB and Universal. At some point between 2011 and his father's death in 2013, Myers inherited his father's shares in SDB. In 2012, Myers hired Eldredge as SDB's COO.

5

Eldredge joined Myers and Robins in Universal's Pennsylvania office. Eldredge testified that around the time he began working for SDB, Mike Myers told him that SDB was "self-certified" as a women-owned small business based on Robins' 51% ownership of the company. J.A. 436. Eldredge testified that he was not familiar with the concept of self-certification. Nevertheless, Eldredge explained that he trusted Myers and joined him in representing SDB as a women-owned small business.

In April 2013, Robins retired from SDB and Universal. Robins testified that she did not perform any work for either company after her retirement. Though Myers and his brother Mark Myers planned to purchase Robins' shares in SDB, Robins remained the company's majority owner for the time being.

ii.    *Smith Joins SDB*

In December 2013, about seven months after Robins' retirement, Myers and Eldredge interviewed Smith for the position of SDB's General Manager. Smith held a Master of Business Administration ("M.B.A.") degree and had experience in government contracting. Eldredge testified that, during the interview, Smith asked if SDB was a women-owned small business. Myers purportedly told Smith that SDB would remain a women-owned small business until Robins sold her shares. According to Smith, no one informed him that Robins had already retired. Smith later accepted an offer for the General Manager position and began working from SDB's Florida office with site manager John Albert in March 2014.

At the start of his employment, Smith was tasked with creating a business plan for SDB and exploring other set-asides that SDB could pursue after Robins sold her shares. In

6

a draft business plan emailed to Eldredge in April 2014, Smith recognized that the majority of the SDB's business came from its subcontracting work for QNA. Smith therefore emphasized the importance of SDB acquiring new government contracts. Smith also identified one of SDB's strengths as being a "woman owned enterprise," as that was how SDB obtained its subcontracting work from QNA. J.A. 1910.

At trial, Smith explained that the representations of Myers and others at SDB led him to believe that the company could legitimately self-certify—as opposed to being formally certified—as a women-owned small business based on Robins' majority ownership interest alone. For instance, prior to circulating the draft business plan, Smith received an email from Albert about SDB's history, in which Albert stated, "We became SDB, a self-certified Woman owned company . . . . Anne has owned 51% of the company from the beginning . . . ." J.A. 1882. Smith testified that this was consistent with what he was told in his job interview with Myers and Eldredge.

### iii. May 2014 Email Chain

In May 2014, Myers emailed Smith, Eldredge and Mark Myers in reference to Smith's ongoing assignment of exploring SDB's eligibility for other set-asides. Myers stated, "Researching the WOSB certification process it seems as though we could remain self certified if my wife was made 51% share holder. However, she would have to leave her current job and work full time for the company." J.A. 1916. Myers explained that "[a]s this is not an option, I will need to discuss plans to transition Anne Robins from president of [SDB]." J.A. 1916. Myers further shared that "the ownership transfer . . . will take another three years." J.A. 1916. But as Eldredge testified, Robins was not the president of

7

SDB at that time. Moreover, the transfer of Robins' shares would not take three years, as Myers and his brother would ultimately purchase the shares only a few months later.

Attached to Myers' email was an eight-page article from the American Bar Association ("ABA"), which metadata confirmed Smith opened. The article was titled "Diversity. How to qualify for the women-owned small business federal contracting program." J.A. 1917. In addition to identifying the two-part definition of a women-owned small business, the ABA article noted that "[t]he requirements for control of the WOSB are somewhat stringent, reflecting the legitimate need to guard against firms attempting to qualify for WOSB status when the woman is merely a figurehead for the company." J.A. 1919–20. The ABA article explained that a woman must hold the highest officer position in the company and must manage the company on a full-time basis in order to satisfy the definition's control prong.

According to Eldredge, Smith—not Robins—was the highest-ranking full-time employee at SDB during the relevant time period. Neither Eldredge nor Myers worked full-time at SDB, and Myers only made the company's long-term decisions. Consistent with Robins' testimony, Eldredge testified that Robins did nothing for the company after her retirement. While Smith testified that he was still unaware of Robins' retirement as of May 2014, he admitted that he was the one responsible for controlling SDB's daily operations during the entire time he worked at the company.

Less than an hour after Myers sent the ABA article, Smith responded with an email to Myers and Eldredge. Therein, Smith explained that Florida's Small Business Development Council could help SDB pursue "formal certification" as a women-owned

8

small business. J.A. 1932. However, Smith acknowledged that "[o]ne of the questions we would have to overcome is how can someone in [Pennsylvania]"—that is, Robins—"run a business in [Florida]. Traditionally, you cannot be certified under this type of scenario without detailed records of involvement." J.A. 1932. Smith therefore stated that "self-certification is our best option at this point." J.A. 1932.

Eldredge testified that he initially shared Smith's purported belief—that, for purposes of obtaining set-asides, SDB could self-certify as a women-owned small business based on Robins' majority ownership. But after reading the ABA article, Eldredge realized that he was mistaken. In an email that Smith indisputably received, Eldredge told Myers and Smith, "If the article is accurate and the explanations of certification are correct (no reason to believe otherwise), then I think we're on very thin ice as 'self-certified' since SDB does not meet the standards for daily business operations controlled by a woman." J.A. 1932 (emphasis in original). Eldredge expressed that he could not "imagine [Robins] agreeing to become involved in daily operations at this point," as she had not been involved with the company's operations in over a year. J.A. 1932. In the same email, Eldredge also responded to Myers' assertion that the transfer of Robins' ownership would take three years, stating that he did not "see any advantage to having [Robins] continue for the next three years, since her involvement in the business isn't sufficient to earn the benefit" of being a women-owned small business. J.A. 1932. Eldredge then questioned whether SDB was, instead, eligible for set-asides as an economically disadvantaged small business. Smith replied to Eldredge with an email stating that he did not think SDB would qualify

9

for those set-asides based on his research. Smith did not offer any response to Eldredge's concerns about representing SDB as a women-owned small business.

In fact, Eldredge testified that Smith never expressed any confusion about the concerns Eldredge raised. Eldredge explained that Smith, instead, continued to represent SDB as a women-owned small business. Eldredge testified that Myers told him and Smith in subsequent conference calls that SDB would remain a women-owned small business until Robins sold her shares in the company. Though Eldredge testified that he knew SDB did not qualify as a women-owned small business at that point, he stated that he agreed to go along with Myers and Smith's false representations by concealing their scheme.

Shortly after the group's email exchange, Smith emailed Myers and Eldredge his final draft of SDB's business plan. In the business plan, Smith noted that "Mike Myers has taken control of [Universal] and SDB and has become more directly involved in SDB business operations." J.A. 1945. He also stated that Myers planned to "acquire the 51% share from Anne Robins essentially making SDB a Small Business versus a Small Woman-Owned Business." J.A. 1945. Smith proposed continuing to identify SDB as a "woman owned enterprise," suggesting that the company "leverage" that status "until no longer applicable." J.A. 1949. He further recognized the existence of "[m]any woman-owned small businesses in area" as an "obstacle[]" for SDB. J.A. 1964–65. Smith also referenced Jacobs Technology in the business plan, as SDB hoped to soon expand its business by obtaining a subcontract from that NASA prime contractor.

In June 2014, after circulating his final draft of SDB's business plan, Smith met with government contracting specialist Patricia Overway of Florida's Small Business

10

Development Council. Overway testified that Smith told her that Robins owned SDB but was not actively involved in the company. According to Overway, she and Smith discussed the WOSB Program's rules, including the eligibility requirement that a woman control the day-to-day operations of the company. Overway also stated that she later emailed Smith some additional guidance, including documents in which the WOSB Program's eligibility requirements were highlighted. She asserted that she highlighted the eligibility requirements for Smith because "there was a red flag that [Robins] did not meet all the eligibility criteria." J.A. 716.

However, Overway admitted on cross-examination that the eligibility requirements were pre-highlighted in the documents, as she sent them to all clients that way. She likewise acknowledged her initial inability to remember the details of her meeting with Smith when first interviewed by agents and prosecutors in 2020. Overway explained that her general practice in client meetings and her review of her email correspondence with Smith later jogged her memory. But based on that email correspondence, Overway conceded that Smith's main reason for meeting with her was to discuss creating a capabilities statement[4] for SDB, not to discuss SDB's status as a women-owned small business. And though Smith subsequently requested Overway's feedback on his draft capabilities statement that referred to SDB as a small woman-owned business, Overway admitted that the feedback she provided Smith did not raise any concerns about that reference.

---

[4] Businesses contracting with the federal government are required to have a capabilities statement, which serves as a sort of company resume.

11

Following his meeting with Overway, Smith sent his capabilities statement to Mike Myers, Eldredge and a consultant working with SDB. In response, the consultant asked, "Is SDB still women-owned?" J.A. 2012. Smith stated, "At the moment, yes, but could change in the very near future." J.A. 2012.

### iv.    The Sale of Robins' Shares

In early July 2014, Smith met Robins for the first and only time when Smith visited Universal's Pennsylvania office. Robins testified that Myers asked her to come to the office to meet Smith. Though Myers brought a copy of the sales agreement for his upcoming purchase of Robins' shares to the office, Robins testified that the sale was not openly discussed in front of Smith. Smith testified that he was still unaware that Robins was retired when he met her. The next day, Smith certified SDB as a women-owned small business in a 22-page form in SAM. The form's first page stated, "I, Kevin Smith, am attesting to the accuracy of the representations and certifications contained herein . . . . I understand that I may be subject to penalties if I misrepresent [SDB] in any of the below representations or certifications to the Government." J.A. 2013.

The following month, Robins sold her shares to Mike and Mark Myers for $115,000. As a result of the sale, Mike Myers became the majority owner of SDB. Smith testified that he was not aware of the sale. Eldredge likewise testified that he was not aware of Myers informing Smith of the transaction. Though Myers emailed Eldredge to inform him of the transaction's completion, he did not copy Smith on that email.

### v.    SDB's Subcontracts

In August 2014, six days before Robins sold her shares, Smith submitted a

12

subcontracting bid on SDB's behalf to Jacobs Technology. Smith's signature appeared in the bid paperwork 23 times. Among the paperwork was a Company Profile Form, in which Smith certified that SDB was a women-owned small business. The paperwork also included the Jacobs Technology Representations and Certifications form, which Smith signed under penalty of perjury. Within that three-page form, which included the two-part definition of a women-owned small business, Smith again certified that SDB was a women-owned small business. Smith also completed the Jacobs Technology Vendor Size Status Certification form, in which he certified SDB as a women-owned small business for a third time. On that form, the term's two-part definition was listed inches above Smith's signature.

In September 2014, Jacobs Technology selected SDB's bid. As a result, Smith had to update SDB's certifications in SAM. Smith acknowledged at trial that before he could certify that SDB was a women-owned small business in SAM, the database provided the two-part definition of the term on the screen, including the requirement a woman be in control of the company's daily operations. Smith testified, however, that he still thought the two-part definition applied only to formally-certified companies, not self-certified companies. Even so, Smith admitted that he believed it would be fraudulent to self-certify as a women-owned small business if a woman merely served as a figurehead of a company. When asked on cross-examination how Robins was not such a figurehead, Smith backtracked and claimed that he did not know the level of Robins' daily involvement at SDB.

13

Nevertheless, Smith testified that had he known that Robins sold her shares after he submitted SDB's bid to Jacobs Technology, he "could have gone to Jacobs and amended [SDB's] certifications." J.A. 1030. However, Smith testified that Myers continued to misrepresent Robins' ownership interest in SDB, thereby preventing him from learning of the sale of Robins' shares until April 2015. But Smith admitted that even after he learned of the sale, he did not immediately contact Jacobs Technology or update SDB's certifications in SAM. It was not until late June 2015, and only after he received a notification that SDB's SAM registration was about to expire, that Smith removed SDB's women-owned small business certification from the database. The following month, Smith also submitted a new subcontract bid to QNA in which he no longer represented SDB to be a women-owned small business. There was no evidence that Smith otherwise informed QNA of his understanding of SDB's new status at that point, despite having requested and received multiple payments from QNA under SDB's existing set-aside contract during the preceding months.

Even after updating SDB's certifications in SAM and submitting a new bid to QNA, Smith waited until October 2015 to inform Jacobs Technology of his understanding of SDB's status change. And Smith only did so after a Jacobs Technology employee asked him to confirm that SDB's information in Jacobs Technology's internal knowledge management system was up to date. After updating SDB's information, Smith emailed the employee stating, "Anne Robbins [sic] who was the 51% owner has informed us she is retiring. Mike and Mark Myers are in the process of buying her shares. I believe this transaction will take place over the next three years. As a result, I removed the women-

14

owned status." J.A. 2131. Smith testified that he knew Robins had already retired and sold her shares at that point, so he was not sure why he worded the email as if neither event had yet occurred.

### vi.      Criminal Investigation

In May 2016, Smith left SDB after Myers and Eldredge decided to reorganize the company. Two months later, Smith received a call from agents at NASA's Office of Inspector General ("NASA OIG"). Smith testified that the agents asked questions about SDB's ownership and its employees' roles. According to NASA OIG Agent Philip Mazzella, Smith shared that Robins was not involved in SDB's daily operations.

A few months later, in November 2016, NASA OIG investigators interviewed Smith for a second time at his home. During this interview, agents showed Smith the May 2014 email exchange in which Eldredge expressed his concerns that SDB was not a women-owned small business because Robins did not exercise control over the company. Agent Mazzella testified that, after being confronted with this email exchange, Smith changed his story by asserting that he did not know Robins' level of involvement at SDB. Agent Mazzella testified that Smith told agents there was no "ill intent" in his representations of SDB as a women-owned small business. J.A. 669.

### vii.      Eldredge's Plea Agreement Statements

Particularly relevant to Smith's appeal are statements from Eldredge's plea agreement that the government introduced during Eldredge's redirect examination at Smith's trial. Prior to Smith's indictment, Eldredge signed a plea agreement in which he agreed to plead guilty to misprision of a felony. Testifying for the government, Eldredge

15

stated during direct examination that he agreed with Myers and Smith to conceal their scheme to falsely represent SDB as a women-owned small business. Later, on cross examination, Smith's counsel asked Eldredge if he had testified on direct that he had "committed fraud with Mr. Smith." J.A. 428. Eldredge replied that he did not remember making such a statement. Smith's counsel then asked if Eldredge's "agreement [was] for something called misprision of a felony." J.A. 428. Eldredge affirmed that he pled guilty to that offense. Eldredge thereafter agreed with Smith's counsel that his plea agreement did not require him to admit to having any "criminal agreement with Mr. Smith" or "commit[ting] fraud with Mr. Smith." J.A. 429.

At the start of its redirect examination of Eldredge, the government sought to introduce the signed statement of facts from Eldredge's plea agreement, in which Eldredge admitted to knowing of Smith and Myers' conspiracy to falsely represent SDB as a women-owned small business. Smith's counsel objected to the statements as hearsay. During a side bar conference, the government argued that the statements were admissible under Federal Rule of Evidence 801(d)(1)(B) as prior consistent statements "on precisely the point of whether there was agreement" between Smith and Myers to falsely represent SDB as a women-owned small business. J.A. 604. The district court ultimately allowed the government to introduce the first two paragraphs of the plea agreement's statement of facts to "rebut[] the impression that [Eldredge] minimized his involvement on cross." J.A. 604.

Reading from the plea agreement's statement of facts, the government asked Eldredge if he had affirmed having "knowledge of the actual commission of a felony," including "conspiracy to commit wire fraud [and] major government fraud," which he took

16

affirmative steps to conceal. J.A. 605. The government also asked Eldredge if he had affirmed that he "knew Michael Myers and Kevin Smith conspired with each other" to defraud Jacobs Technology and the federal government by fraudulently representing SDB as a women-owned small business. J.A. 606. Eldredge agreed that these statements were "all true" and "in fact what happened," agreeing that no one "put those words in [his] mouth." J.A. 607. He further confirmed that he signed his plea agreement before he knew that Smith would be indicted.

### viii.    Verdict and Post-Trial Motions

After deliberating for a little over four-and-a-half hours, the jury returned a verdict finding Smith guilty of conspiracy and five counts of wire fraud. Smith subsequently moved for judgment of acquittal under Rule 29 and for a new trial under Rule 33. In his motion for judgment of acquittal, Smith asserted that there was insufficient evidence to show that he knowingly misrepresented SDB as a women-owned small business. Smith argued that the evidence, instead, showed that Smith did not know or understand the two-part definition of a women-owned small business. The government disagreed, asserting that there was sufficient evidence to show Smith's criminal intent. And in his motion for a new trial, Smith alleged that the district court improperly admitted hearsay statements from Eldredge's plea agreement. Contrary to its assertion at trial, the government responded that "Rule 801(d)(1)(B) [was] likely not even implicated at all." J.A. 1535. The government argued that its use of the statements was for the non-hearsay purpose of rehabilitation under the rule of completeness. To the extent Rule 801(d)(1)(B) was implicated, however, the government maintained that the statements were still admissible.

17

The district court denied both motions. With respect to the motion for judgment of acquittal, the district court determined that the evidence, when "viewed most favorably to the Government, clearly constitute[s] substantial evidence upon which a rational[] jury could conclude [Smith]'s guilt beyond a reasonable doubt on all Counts of conviction, even in the face of the other evidence from which it might have inferred innocence." J.A. 1754. The district court further concluded that the evidence and testimony concerning Eldredge's plea agreement were "properly admitted to rehabilitate Eldredge," such that Smith was not entitled to a new trial. J.A. 1760.

Later, Smith was sentenced to one year of probation with special conditions of three months of home detention and 100 hours of community service. He was also ordered to pay a $5,000 fine.

## II. ANALYSIS

Smith raises two challenges on appeal.[5] First, Smith maintains that the district court erred by denying his Rule 29 motion for judgment of acquittal, as there was insufficient evidence to show that he knowingly agreed to misrepresent SDB as a woman-owned small business and knowingly did the same. According to Smith, the government failed "to establish that Mr. Smith knew and understood the requirement that a woman must not only own, but also control, the company." Op. Br. at 46. Smith asserts that the evidence at trial actually demonstrated his misunderstanding of the definition's application, which the

---

[5] We have jurisdiction under 28 U.S.C. § 1291.

18

government made no attempt to rebut. Smith therefore avers that he should be acquitted on all counts.

Second, Smith argues that the district court erred by denying his Rule 33 motion for a new trial based on its admission of hearsay statements from Eldredge's plea agreement. Smith contends that the statements are not admissible as prior consistent statements under Rule 801(d)(1)(B)(i) because Eldredge had a motive to lie when signing his plea agreement and because Eldredge was not subject to cross-examination in accordance with the Rule's requirement. Smith also argues that the statements are not admissible under the doctrine of completeness, despite the government's post-trial insistence. Smith alleges that the erroneous admission of these statements was highly prejudicial, requiring a new trial.

We address these arguments in turn.

## A.  Sufficiency Challenge

We review the denial of a Rule 29 motion for judgment of acquittal de novo. *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018). We "must consider all of the evidence admitted by the trial court, regardless of whether that evidence was erroneously admitted." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (per curiam) (internal quotations omitted). If a jury's verdict is supported by substantial evidence, it will be upheld. *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018). Our "limited review" of the sufficiency of the evidence "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Rather, where the record supports competing inferences, we must

infer "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

"A sufficiency challenge presents a 'heavy burden,' which a defendant will only overcome in 'cases where the prosecution's failure is clear.'" *United States v. Zayyad*, 741 F.3d 452, 462 (4th Cir. 2014) (quoting *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013)). In other words, "a judgment of acquittal is appropriate when the evidence is so deficient that acquittal is 'the *only* proper verdict.'" *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)).

Here, Smith challenges the sufficiency of the evidence supporting his convictions for wire fraud and conspiracy to commit wire fraud. To prove that a defendant committed wire fraud in violation of 18 U.S.C. § 1343, the government must show "that the defendant (1) devised or intended to devise a scheme to defraud and (2) used or caused the use of wire communications in furtherance of that scheme." *Burfoot*, 899 F.3d at 335. Conspiracy to commit wire fraud under 18 U.S.C. § 1349 requires a showing "that (1) two or more persons agreed to commit wire fraud and (2) the defendant willfully joined the conspiracy with the intent to further its unlawful purpose." *Id.*

Smith contends that there was insufficient evidence at trial to show that he had the requisite criminal intent to commit either offense. Specifically, Smith insists that the government failed to show he knew and understood the two-part definition of a women-owned small business and its application to SDB. Smith raises three primary arguments in support of his position. First, Smith contends that the government never accounted for evidence demonstrating that Myers made deceptive representations to Smith about SDB's

20

status as a women-owned small business and that Smith believed those deceptive representations. Smith also takes issue with the fact that the government did not call Myers to testify. Second, Smith argues that the government failed to challenge his testimony that he believed in good faith that SDB could self-certify as a women-owned small business. Third, and finally, Smith avers that the government did not account for evidence showing that he told third parties that Myers controlled SDB while simultaneously representing SDB as a women-owned small business. Smith contends that these statements were not consistent with his guilt, as they support his contention that he did not understand what was required to be a women-owned small business. According to Smith, Myers' misrepresentations, Smith's testimony and Smith's statements to third parties are "precisely the kind of 'contradictory facts' that render the government's evidence insufficient as a matter of law." Op. Br. at 46 (quoting *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011)).

However, to the extent that Smith emphasizes Myers' misrepresentations and Smith's own statements to third-parties about Myers' control of SDB, Smith essentially asks us to reweigh the evidence. By reweighing this evidence, we would be usurping the jury's role as fact finder. *See Musacchio*, 577 U.S. at 243. The jury already weighed Myers' misrepresentations and Smith's statements to third parties against conflicting evidence, presumably resolving the conflict in the government's favor. *See Jackson*, 443 U.S. at 326. And though Smith takes issue with the fact that the government did not call Myers as a witness, this does not go to the question of whether there was substantial evidence at trial

21

to support Smith's convictions. In any event, there is no way to know whether Myers' testimony would have helped or hurt Smith's defense.

Additionally, in stressing that the government never challenged his testimony that he did not understand the two-part definition of a women-owned small business, Smith appears to suggest that we should reject the jury's determination of his credibility. But like reweighing the evidence, making our own credibility determinations would impermissibly infringe on the jury's fact-finding role. *See Musacchio*, 577 U.S. at 243. Under the legal standard governing sufficiency challenges, we are to assume that the jury resolved credibility conflicts in the government's favor. *Id.* Thus, while Smith contends that he testified truthfully that he did not know or understand the definition of a women-owned small business, we cannot take him at his word.

The only case law upon which Smith relies in support of his position is our opinion in *United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011). Quoting the language of that opinion, Smith contends that his statements to third parties, his testimony at trial and Myers' misrepresentations amount to "missing, flawed, or contradictory facts" that cannot support the jury's verdict. *See* Op. Br. at 46, 48 (quoting *Bonner*, 648 F.3d at 213). A look at the facts and holding of *Bonner* suggest that Smith's reliance on that opinion is misplaced.

In *Bonner*, we affirmed a district court's acquittal of a defendant due to insufficient evidence. 648 F.3d at 216. There, the defendant was charged with Hobbs Act robbery and a firearm offense for allegedly robbing a Subway restaurant with an accomplice. *Id.* at 211. There was no description of the robbers other than that they were African American males

22

who fled the robbery in a "pink" or "reddish" SUV. *Id.* One of the robbers was also described as wearing a Yankees hat. *Id.* In the restaurant parking lot, responding officers stopped a burgundy SUV driven by a man whom restaurant employees confirmed was not one of the robbers. *Id.* at 212. Inside the SUV, which was only occupied by the driver, the officers located the defendant's wallet and cell phones belonging to the defendant's girlfriend, the defendant's cousin, and the driver. *Id.* Police also recovered a Yankees hat near the restaurant's dumpster, which contained multiple DNA profiles. *Id.* Forensic analysts matched the "predominant" profile to the defendant but did not attempt to identify any of the other DNA profiles. *Id.* During a search of the area, canine trackers tracked the scent of the Yankees hat to a gas station. *Id.* Police later learned that, almost five hours after their search, the defendant made a phone call to his girlfriend from that gas station. *Id.* They also learned that the defendant called his girlfriend and cousin from his cell phone after the robbery. *Id.* With no other evidence presented by the government, the district court granted the defendant's motion for judgment of acquittal. *Id.* at 213. We stated that "the [district] court relied on several missing, flawed, or contradictory facts which were presented by the government to conclude that the evidence against [the defendant] was insufficient." *Id.*

Affirming the district court's decision, we determined that "there [was] a conspicuous absence of any contemporaneous 'identity' evidence linking the defendant to the robbery." *Id.* at 214. We explained that "[t]he government's entire case consist[ed] of four pieces of circumstantial evidence":

23

> (1) A hat with multiple DNA matches worn by [the defendant] was also worn by one of the robbers; (2) [the defendant]'s wallet, discovered in the alleged getaway car; (3) phone records showing calls from [the defendant]'s cell phone to [his girlfriend] and [his cousin] the night after the robbery; and (4) a separate phone record showing a call from a nearby gas station to [his girlfriend].

*Id.* We recognized that though "it is possible to convict a defendant solely on circumstantial evidence, in cases where the identity of the perpetrator is in dispute, usually there is some specific 'identity' evidence or uncontroverted physical evidence that links the defendant to the scene of the crime." *Id.* Instead, the government relied on the insufficient scientific theory that, because the defendant's DNA was the "predominant" profile on the hat, he must have been the last one to wear it. *Id.* at 215. We concluded that this "scientific theory as to identity lack[ed] any evidentiary support in [the] record." *Id.*

Smith does not explain why *Bonner* applies to his case. Our concern in *Bonner* was the government's exclusive use of circumstantial evidence at the defendant's trial where no identity evidence linked him to the crime. But at Smith's trial, there was no dispute about the "the identity of the perpetrator." *See id.* at 214. Smith does not dispute that he represented SDB to be a women-owned small business, resulting in SDB's receipt of wire payments under lucrative set-aside contracts. He instead only challenges the sufficiency of the evidence as it relates to his knowledge and understanding that SDB did not actually qualify as a women-owned small business under the WOSB Program.

Smith seems to rely on *Bonner* only for the language we used in dicta to describe what the district court considered when acquitting the defendant—"missing, flawed, or contradictory facts." *See id.* at 213. Smith applies this language to his own testimony, his

24

statements to third parties and Myers' misrepresentations to suggest that the jury's verdict cannot stand. But that was simply evidence that arguably supported Smith's defense. The jury was not required to credit Smith's evidence over the government's contrary evidence. And while Smith relatedly contends that there was no evidence that he understood the two-part definition of a women-owned small business, he seems to take issue with the lack of direct evidence of his understanding. But even *Bonner* recognizes that, generally, "a conviction may rely entirely on circumstantial evidence." 648 F.3d at 213.

Contrary to Smith's position, there was ample evidence that Smith knew and understood that (1) Robins did not control the daily operations of SDB, and (2) SDB did not qualify as a women-owned small business unless a woman controlled its daily operations. Concerning the first point, Smith testified at trial that SDB's daily operations were not controlled by a woman. Rather, Smith testified that *he* controlled SDB's daily operations. This is consistent with Smith's own email to third parties in April 2015, in which he stated that he "manage[d] day to day operations of SDB on [Mike Myers'] behalf." J.A. 2096. And though Smith testified that he did not know of Robins' involvement in SDB, this was inconsistent with Smith's initial statements to Agent Mazzella that Robins was not involved in the company's daily operations, as well as Robins' and Eldredge's testimony that Robins performed no work for the company while Smith worked there. Overway relatedly testified that Smith told her that Robins was not involved in SDB.

To the second point, the jury could have reasonably rejected Smith's argument that, despite having an M.B.A. and experience in government contracting, he failed to

25

understand the two-part definition of a women-owned small business when it was repeatedly brought to his attention. Indeed, there was evidence from which the jury could have inferred Smith understood the definition of a women-owned small business, such as: (1) his May 2014 email exchange with Myers and Eldredge, both of whom addressed the two-part definition; (2) the ABA article that Smith indisputably opened; (3) the women-owned small business definition displayed on the screen in SAM before Smith confirmed SDB's certification as a women-owned small business; (4) the verbal and written guidance Overway provided to Smith; (5) the Jacobs Technology Representation and Certifications form that defined a women-owned small business, which Smith signed under penalty of perjury; and (6) the Jacobs Technology Vendor Size Status Certification form that defined a women-owned small business inches above Smith's signature. Moreover, Smith himself testified that he thought it would be fraudulent for a company to self-certify as a women-owned small business if a company only had a female figurehead—which is what Robins appeared to be, based on consistent testimony and evidence presented at trial.

Juries are permitted to draw factual inferences, such as a defendant's criminal intent, from circumstantial evidence. *United States v. Hamilton*, 701 F.3d 404, 409 (4th Cir. 2012). And even in the case of conspiracy, knowledge is often proven by circumstantial evidence. *United States v. Millender*, 970 F.3d 523, 529 (4th Cir. 2020); *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004). The evidence identified by the government permitted the jury to infer that Smith knew and understood the two-part definition of a women-owned business and that SDB did not meet it. Smith was confronted with the two-part definition on numerous occasions, from the May 2014 email exchange in which Eldredge made his

26

concerns clear to the forms he signed to secure the Jacobs Technology subcontract. Smith, who holds an M.B.A. and possesses experience in government contracting, does not dispute that the definition plainly requires a woman to control a company's daily business operations for the company to qualify as a women-owned small business. Yet, Smith himself testified that he controlled the daily operations of SDB during his entire employment at the company.

Considering all evidence in the light most favorable to the government, and assuming the jury resolved all conflicts in the government's favor, Smith has not carried the "heavy burden" of showing no substantial evidence supports his convictions. *See Zayyad*, 741 F.3d at 462.

## B.  Hearsay Challenge

We now turn to Smith's argument that the district court erred in denying his motion for a new trial based on its admission of hearsay from Eldredge's plea agreement. We review a district court's denial of a Rule 33 motion for a new trial for abuse of discretion. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). A district court "'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *Id.* at 217 (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)). We also review a district court's evidentiary rulings for abuse of discretion. *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011). Evidentiary rulings are further subject to harmless error review. *See United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997).

Smith contends that the district court abused its discretion by denying his motion

27

for a new trial based on its admission of the following two paragraphs from the statement

of facts within Eldredge's plea agreement:

> As set forth in greater detail below, beginning in at least or about May 2014 and continuing thereafter through in or about July 2016 . . . [Eldredge], having knowledge of the actual commission of a felony cognizable by a court of the United States, namely conspiracy to commit wire fraud, major government fraud, false statements, falsification of records, and to defraud the United States, did conceal the same by taking affirmative action to conceal that crime, and did not, as soon as possible, make known the same to some judge or other person in civil or military authority under the United States.
>
> . . . .
>
> Mr. Eldredge knew Michael Myers and Kevin Smith conspired with each other and others to defraud [Jacobs Technology] . . . and, in turn, NASA and other components of the U.S. government, by, among other things, fraudulently representing to [Jacobs Technology], the U.S. government, including NASA, and others that [SDB] was a women-owned small business as defined by the Small Business Administration.

J.A. 605–07. As previously noted, the government offered the statements at trial as prior

consistent statements under Rule 801(d)(1)(B)[6] at trial. The district court permitted the

government to introduce them as statements "that rebut[] the impression that [Eldredge]

minimized his involvement on cross." J.A. 604.

---

[6] Federal Rule of Evidence 801(d)(1)(B) provides that "[a] statement that meets the following conditions is not hearsay":

> [t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground[.]

28

Notably, though the government offered the statements at trial under Rule 801(d)(1)(B), the government asserted post-trial that Rule 801(d)(1)(B) likely did not even apply. While preserving its Rule 801(d)(1)(B) argument, the government primarily argued that the statements were admissible for the non-hearsay purpose of rehabilitation under the doctrine of completeness. But on appeal, the government largely relies on Rule 801(d)(1)(B) to demonstrate the statements' admissibility. Still, the government maintains that the statements are admissible under both Rule 801(d)(1)(B) and for the non-hearsay purpose of rehabilitation under the doctrine of completeness. Smith argues that the statements were impermissible hearsay and should not have been permitted under either Rule 801(d)(1)(B) or the doctrine of completeness.

We need not determine whether the district court erred in admitting the statements under either theory, as any error in the admission of Eldredge's plea agreement statements was harmless. "Erroneously admitted evidence is harmless if a reviewing court is able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "This inquiry is not whether, absent the improperly admitted evidence, sufficient evidence existed to convict. . . . Rather, the inquiry is whether we can say that we believe it highly probable that the error did not affect the judgment." *United States v. Lighty*, 616 F.3d 321, 356 (4th Cir. 2010) (internal quotes and citations omitted).

29

According to Smith, the admission of Eldredge's plea agreement statements was not harmless error. Smith contends that the error was extremely prejudicial, as the statements were used for the truth of the matter asserted, were "couched in highly prejudicial legalese that tracked the language of the indictment" and were never actually spoken by Eldredge, given the statements were presumably drafted by the government. Reply Br. at 18–19. However, the government asserts that any error was harmless, as the statements and surrounding testimony did not disturb the objective evidence at trial that Smith knew and understood that SDB did not qualify as a women-owned small business yet represented it as one to obtain set-asides.

We agree with the government. We find it "highly probable" that any such error did not affect the jury's judgment in this case. *See Lighty*, 616 F.3d at 356. Setting aside Eldredge's plea agreement statements, the government presented ample admissible evidence supporting the finding that Smith agreed to falsely represent SDB as a women-owned small business to obtain set-asides. Smith—an M.B.A. holder with government contracting experience—viewed the women-owned small business definition on numerous occasions. Despite the undisputed fact that SDB did not meet that definition, Smith repeatedly represented that it did. Moreover, though Eldredge's plea agreement statements were prejudicial, defense counsel's cross-examination of Eldredge had already revealed to the jury that Eldredge may have been motivated to enter that plea agreement to receive leniency in his own criminal case. For these reasons, we conclude that any error in admitting Eldredge's plea agreement statements was harmless.

30

## III.  CONCLUSION

Because we find that sufficient evidence supports Smith's convictions and that any error in the admission of Eldredge's plea agreement statements was harmless, we affirm Smith's convictions.

*AFFIRMED*